# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| MARIA KINSEL, | : | |
| Plaintiff, | : | |
| | | Case No. 3:12cv00235 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| CAROLYN COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Acting Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

Plaintiff Maria Kinsel brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  Plaintiff protectively filed her SSI and DIB applications on January 11, 2007, asserting that she has been under a "disability" since January 1, 2006.  (*PageID##* 185-87, 188-90).  Plaintiff maintains that she is under a benefits-qualifying disability due to bipolar disorder, Alzheimer's, and heart problems.  (*See PageID#* 203).

After various administrative proceedings, Administrative Law Judge (ALJ) Thaddeus J. Armstead denied Plaintiff's applications based on his conclusion that Plaintiff's

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

impairments did not constitute a "disability" within the meaning of the Social Security Act. (*PageID##* 71-82). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. This Court has jurisdiction to review the administrative denial of her applications. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. # 11), the administrative record (Doc. #6), and the record as a whole.

## II. Background

### A. Plaintiff's Vocational Profile and Testimony

Plaintiff was 49 years old on the date the ALJ issued his decision, which placed her in the category of a "younger individual" for purposes of resolving her DIB and SSI claims. *See* 20 C.F.R. §§404.1563(c); 416.963(c);[2] (*PageID##* 80, 198). Plaintiff has a high school education. *See* 20 C.F.R. §404.1564(b)(4); (*PageID#* 98). Although Plaintiff has worked in the past, she has no past relevant employment due to her modest earnings. (*PageID##* 121-22).

During the ALJ's hearing, Plaintiff testified that she is 5'7" and weighs 155 lbs. (*PageID#* 95). She has gained 45 pounds in the last couple of years. (*PageID##* 95-96). In 2005, Plaintiff was convicted of forging checks and underwent a period of probation, which

---

[2] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

ended three to four months before the hearing.  (*PageID##* 99-100).  She has not worked since January 2006.  (*PageID#* 100).  She left her last job because she went into a depression and did not want to leave her house.  (*PageID#* 120).  Plaintiff testified that she is unable to work due to depression, dementia, early Alzheimer's type, and she has been diagnosed with bipolar disorder.  (*PageID##* 101-02, 118-19).

Plaintiff also testified about her history of cocaine use.  She experienced two relapses: one in February 2008, the other in January 2009.  (*PageID##* 104-05).

Plaintiff testified that she had been seeing Dr. Rahman for her mental-health problems "for about 13 years." (*PageID* #106)*.* Her treatment with Dr. Rahman has been "on and off" because she lacked money to pay for more consistent office visits.  (*PageID##* 106-07).  She sees Dr. Rahman once a month for about 30 to 45 minutes.  (*PageID#* 112).

 Plaintiff noted she has difficulty sleeping at night due to depression.  (*PageID#* 110).  At the time of the hearing, she was taking four different medications that caused no side effects.  (*PageID#* 112).  Due to depression, she suffers crying spells "[a]bout every day." (*PageID#* 113).  She also suffers from dementia type symptoms but could not remember when her symptoms began.  (*Id.*).  She described her concentration as "poor" and her memory as "[n]ot as good as I want it to be." (*Id.*)

She further testified to problems maintaining attention, noting that she has missed a lot of her doctor appointments.  (*PageID#* 114).  A friend helps her pay bills, takes her to doctor appointments and goes grocery shopping.  (*PageID##* 114-15).  Plaintiff reported that she does not like to be around other people.  (*PageID#* 115).  She does not go to church.

3

(*Id.*).  She typically stays in her pajamas during the day, noting, "I just don't feel like getting dressed."  (*PageID#* 116).

**B.  Relevant Medical Opinions**[3]

Plaintiff relies on the opinion of Mahmood Rahman, M.D., a board-certified psychiatrist at Greene Pak Psychiatric Service.  Dr. Rahman treated Plaintiff off and on from June 1, 2001 through November 3, 2009.  (*PageID##* 476-78, 493-514, 540-44).  During 2006 through 2008, Dr. Rahman documented objective clinical observations that Plaintiff was anxious, labile, agitated, and had flights of ideas.  (*PageID##* 498-501).

On July 1, 2008, Dr. Rahman assessed Plaintiff three times.  In a "Diagnostic evaluation," Dr. Rahman reported that Plaintiff had developed post traumatic stress disorder (PTSD) from the physical abuse by her husband that progressively worsened.  He observed that during treatment sessions, "she quite often displays psychomotor retardation [with] constricted affect and paucity of thought.  Appears nervous and depressed."  (*PageID#* 479).  Dr. Rahman diagnosed Plaintiff with bipolar affective disorder with paranoid delusion and PTSD and chronic pain.  He assigned Plaintiff a Global Assessment of Functioning (GAF) score of 40-45,[4] referring to severe symptoms or  a serious impairment in social or

---

[3] The record contains a number of medical reports and correspondence from physicians who treated Plaintiff for physical ailments not at issue in this case. That evidence is not addressed herein.

[4] "Global Assessment Functioning" is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 32-34.

4

occupational functioning" <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision at 34. Dr. Rahman concluded that Plaintiff's prognosis was guarded and he opined, "I do not think that she can engage in any meaningful productive work activity." (*Id.*).

In July 2008, Dr. Rahman completed a Medical Assessment of Ability To Do Work Related Activities, wherein he opined that Plaintiff had poor or no ability to (1) deal with the public; (2) deal with work stresses; (3) function independently; (4) maintain attention and/or concentration; (5) understand, remember, and carry out detailed and complex job instructions; (6) behave in an emotionally stable manner; (7) relate predictability in social situations; and (8) demonstrate reliability.  (*PageID##* 480-82).

Dr. Rahman also completed interrogatories concerning Plaintiff.  (*PageID##* 483-92). Dr. Rahman acknowledged that the combination of her physical and mental impairments were greater than the sum of her impairments.  (*PageID#* 484).  He continued, "If Maria was only suffering from BAD[bipolar affective disorder]/PTSD <u>or</u> chronic pain, her disability would have been far less, however her impairment is considerably compounded because of the combined effect of physical and mental afflictions."  (*PageID#* 485)(emphasis in original).  Dr. Rahman also noted, "It is well know that in those individuals who are suffering from chronic pain disorders[,] the perception of pain is enhanced if there is underlying depression.  In all probability her perception of pain is enhanced because of underlying depression.  In addition, her coping skills are compromised because of chronic pain and depression."  (*Id.*).

5

In discussing her work abilities, Dr. Rahman found that Plaintiff would be unable to be prompt and regular in attendance "especially taking into consideration the combined difficulties of physical and emotional problems." (*PageID* #486). Dr. Rahman also concluded that Plaintiff could not respond appropriately to supervision, co-workers, and customary work pressures; he explained, "When subjected to the demands of customary work pressures, she will not be responding appropriately to coworkers or supervision." (*Id*.).

Dr. Rahman believed that if Plaitniff was "subjected to pressure of work productivity[,] she is liable to decompensate physically and/or emotionally." (*Id*. #487). Dr. Rahman next explained that Plaintiff's "attention & concentration are compromised due to racing thoughts and distractibility, both of which are hallmarks of Bipolar psychopathy." (*Id*.). Dr. Rahman also opined – with additional supporting reasons – that Plaintiff lacked the ability to (1) understand, remember, and carry out simple work instructions without requiring very close supervision; (2) behave in an emotionally stable manner; (3) relate predictability in social situations; (4) demonstrate reliability; (5) maintain concentration and attention for extended periods (about two-hour periods each); (6) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (7) complete a normal workday or workweek without interruptions from psychologically and/or physically based symptoms; and (8) respond appropriately to changes in a routine work setting. (*PageID* ## 487-90).

Dr. Rahman explained that Plaitniff would not get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes because "others could be

6

easily distracted by her erratic and unpredictable emotional lability." (*PageID* # 490).  And

Dr. Rahman opined that Plaintiff would not be able to sustain ordinary routine without

special supervision; work in coordination with, or proximity to, others without being unduly

distracted by them; or accept instructions and respond appropriately to criticism from

supervisors.  (*PageID* ## 490-91).

Dr. Rahman concluded that Plaintiff had marked limitations in her daily living,

moderate limitations in her social functioning, and marked deficiencies of concentration,

persistence or pace.  (*PageID*## 491-92).

On April 1, 2009, Dr. Rahman again opined that Plaintiff was unable to work.

(*PageID*# 542).

Psychologist Giovanni Bonds, Ph.D. evaluated Plaintiff on February 12, 2007 at the

request of the Ohio Bureau of Disability Determination.  (*PageID*## 285-95).  Plaintiff

reported to Dr. Bonds that she lived with her 80-year-old aunt.  Plaintiff did not have friends

and only talked to her aunt.  Before she began living with her aunt, Plaintiff was arrested and

charged with check forgery.  She explained to Dr. Bonds that she had signed checks

belonging to a sick friend she was caring for.  The friend told her to sign the checks. Later,

when the friend was hospitalized, his family learned that Plaintiff had been signing his

checks. The family told the police.  Her attorney advised her to plead guilty.  She did and

was placed on probation.  (*PageID*# 285). On another occasion, Plaintiff was arrested for

possession of a gun but was not convicted. (*Id*.).

Plaintiff informed Dr. Bonds that she "has a passion for helping the homeless; she

collects food and clothes and takes it to the homeless people." (*PageID#* 286). She does not participate in leisure activities. She went to church four times a week. She left school in the eighth grade because she was pregnant and got married. (*PageID#* 286).

Plaintiff stated that she had felt depressed almost daily for the previous couple of years. She also reported isolating herself, feeling fatigue, eating problems, mood swings, and hostility toward men. Dr. Bonds observed that she was anxious and fidgety. (*PageID#* 288). During the mental status examination, Dr. Bonds found she was cooperative during the evaluation and had normal mood and affect without suicidal ideation or psychosis. (*Id.*). She appeared a little nervous and tense, but denied any panic attacks. (*Id.*). She was oriented but reported difficulty with memory loss. (*PageID##* 288-89). Dr. Bonds wrote that Plaintiff's "comprehension, judgment, and reasoning abilities are far below average and it seems that she would have difficulty in managing her funds, living independently, and making important decisions about her future without some assistance or supervision...." (*PageID#* 289).

Plaintiff completed several intelligence tests. On the WAIS-III, she scored 62 on the Verbal IQ, 75 on the Performance IQ, and 65 on the Full Scale IQ. (*PageID##* 290-91).

Dr. Bonds diagnosed Plaintiff with early onset of Alzheimer-type dementia. He assessed Plaintiff's GAF at 55, referring to moderate symptoms or moderate difficulty in social or occupational functioning. (*PageID#* 293); *see* <u>DSM-IV-TR</u> at p. 34.

As to Plaintiff's mental-work abilities, Dr. Bonds opined that Plaitniff's was mildly limited in her ability to relate to peers, supervisors, or the public due to anxiety, depressed

8

mood, and irritability. Dr. Bonds concluded that Plaintiff was severely limited in her ability

to understand, remember, and follow directions "[a]s indicated by her very low IQ scores and

very low Immediate, General, and Working Memory Indexes."  (*PageID*## 294). According

to Dr. Bonds, Plaintiff was mildly limited in her ability to maintain attention, concentration,

persistence, and pace.  Dr. Bonds further found that Plaintiff's ability to deal with work

stress was moderately limited.  (*Id.*).  And he concluded that Plaintiff's memory problems

would cause difficulty with following and carrying-out instructions, but she could still

perform simple and repetitive tasks with only mild limitations.  (*Id.*).

Alice Chambly, Psy.D., reviewed the file on behalf of the Ohio BDD on April 24,

2007.  (*PageID*## 316-33).  Dr. Chambly opined that Plaintiff was moderately limited in her

ability to (1) understand, remember, and carry out detailed instructions; (2) work in

coordination with or proximity to others without work-related being distracted by them; (3)

complete a normal workday or workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of

rest periods; (4) interact appropriately with the general public; (5) accept instructions and

respond appropriately to criticism from supervisors; (6) respond appropriately to changes in

the work setting; and (7) set realistic goals or make plans independently of others.

(*PageID*## 316-17).  Dr. Chambly also found that Plaintiff was mildly restricted in her daily

activities, had moderate difficulties in her social functioning and in her concentration,

persistence, or pace.  (*PageID*# 330).  Dr. Chambly determined that the evidence does not

establish the presence of the "C" criteria.  (*PageID*# 331). Dr. Chambly concluded that

9

Plaintiff retained the ability to perform simple, routine tasks in low-stress settings free of stringent time demands, strict production quotas, and few interpersonal interactions. (*PageID#* 319).

On August 10, 2007, psychologist Vicki Casterline, Ph.D. affirmed Dr. Chambly's assessment without providing her own analysis. (*PageID#* 356).

### III.   Administrative Review

#### A.   "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

#### B.   ALJ Armstead's Decision

ALJ Armstead resolved Plaintiff's disability claim by using the five-Step

sequential evaluation procedure required by Social Security Regulations.  *See PageID## 72-73; see also* 20 C.F.R. § 404.1520(a)(4).  His pertinent findings began at Step 2 of the sequential evaluation where he concluded that Plaintiff had the following severe impairments: asthma; obstructive sleep apnea; possible early onset of dementia, Alzheimer's type; bipolar disorder; cocaine abuse disorder; and posttraumatic stress disorder.  (*PageID#* 73).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner Listing of Impairments.  (*PageID#* 75).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity (RFC)[5] to perform work at all levels of exertion with the following non-exertional restrictions:

> simple, repetitive tasks that require no more than 10 minutes to accomplish each repetitive task; no strict time demands or strict production quotas; no more than occasional interpersonal interactions; and no exposure to concentrated heat, cold, wetness, humidity, generally noxious odors, fumes, gases, poor ventilation, or dust.

(*PageID#* 79).  The ALJ further found that Plaintiff has not engaged in past relevant work.

At Step 5, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy, including, for example, hand packager (medium work), mail clerk (light work), and polishing machine operator (sedentary work).

_____

[5] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r. of Social Security*, 582 F.3d

647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.     Discussion**

**A.      The Parties' Contentions**

Plaintiff contends:

> The ALJ erroneously rejected the opinion of Dr. Bonds and relied on the opinions of the non-examining State agency reviewers who opined that "Dr. Bonds's report is not sufficient evidence of a true cognitive disorder though early onset dementia has been retained as an impairment, and the claimant is limited to simple, repetitive tasks, which Dr. Bonds concluded she could perform."

(Doc. #7, *PageID*# 562 (quoting, in part, ALJ's Decision, *PageID*# 75)). Plaintiff also contends that the ALJ erred by rejecting the opinions of treating psychiatrist Dr. Rahman. Plaintiff explains, "Although he relied on the opinion of the non-examining State agency reviewers to reject the opinion of Dr. Bonds, the ALJ gave no medical opinion in rejecting the opinion of Dr. Rahman." (Doc. #7, *PageID*# 566). Plaintiff maintains, "The ALJ is not a mental health expert, yet he substituted his opinion for the mental health experts, Drs. Rahman and Bonds. Thus, the ALJ's decision is not based on substantial evidence and should be reversed." *Id*. Plaintiff further argues, "The ALJ erred in finding that Dr.

Rahman's opinion was [sic; presumably "not"] based on clinical findings..." and "erred by relying on the fact that Plaintiff's mental impairments might have been controlled by adequate treatment."  *Id.*, *PageID* at 567.

The Commissioner argues that the ALJ reasonably evaluated the medical evidence and provided a well-reasoned explanation as to why he discounted Dr. Rahman's opinions.

**B.**   **Applicable Standards and Analysis**

Social security regulations recognize several different categories of medical sources: treating physicians and psychologists, nontreating yet examining physicians and psychologists, and nontreating yet record-reviewing physicians and psychologists.  *Gayheart v. Comm'r of Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Id.*, 710 F.3d at 375 (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1).

A treating source's opinion may be given controlling weight under the treating-physician rule only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Id*. at 376 (citing 20 C.F.R. §404.1527(c)(2)). "If the Commissioner does not give a treating-source opinion controlling

14

weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

Unlike treating physicians, "opinions from nontreating and nonexamining are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id.* (citing 20 C.F.R. §§404.1572(c), 404.1527(c)(6)).

The ALJ accorded no "controlling weight" to Dr. Rahman's January 2008 opinions due to his belief that Dr. Rahman "has not adequately established that he has prescribed a regular treatment regimen or, if he has, shown any manner in which he has monitored claimant's compliance with it or with refraining from drugs, such as ordering regular drug screens." (*PageID#* 77). The ALJ also accorded no controlling weight to Dr. Rahman's April 2009 opinion "because he does not elaborate on the type of health reasons." (*Id.*).

The ALJ rejected Dr. Bonds opinions, stating, "the ratings by Dr. Bonds were inconsistent with her objective findings. The BDD limited the claimant to low stress work, with no strict time or production quotas, and few interpersonal contacts (6F). Those restrictions have been added to the residual functional capacity. The undersigned concurs with the BDD that Dr. Bonds's report is not sufficient evidence of a true cognitive disorder

15

though early onset dementia has been retained as an impairment, and the claimant is limited to simple, repetitive tasks, which Dr. Bonds concluded she could perform." (*PageID#* 75)

The ALJ based his assessment of Plaintiff's mental work abilities on the opinions of Drs. Chambly and Casterline who reviewed the records for the Ohio BDD. The ALJ wrote, "the undersigned concurs with the BDD that Dr. Bonds's report is not sufficient evidence of a true cognitive disorder though early onset dementia has been retained as an impairment, and the claimant is limited to simple, repetitive tasks, which Dr. Bonds concluded she could perform." (*PageID#* 75).

The ALJ's reliance on the opinion of the non-examining, non-treating state agency psychologists is unsupported by substantial evidence and the dismissal of the opinion of Dr. Rahman is erroneous for several reasons. First, Dr. Rahman is a board-certified psychiatrist who has been treating Plaintiff since June 1, 2001. The record reflects that Dr. Rahman has seen Plaintiff on at least 27 occasions. (*PageID##* 476-78, 493-514, 540-44). Of all of the medical professionals involved in this case, it is clear that Dr. Rahman is the one most familiar with Plaintiff's condition and limitations given the amount of treatment Dr. Rahman has provided.

Second, although there can be cases where opinions from state-agency medical consultants may be entitled to greater weight than the opinions of treating physicians, *see e.g. Blakley*, 581 F.3d at 408-409, such is not the case here. There is no indication in the ALJ's decision that he applied the factors required by the Regulations to Drs. Chambly and Casterline's opinions; instead, he simply agreed with them. (*PageID##* 75, 79). This was an

16

error since the ALJ failed to apply the correct legal criteria to the opinions of Drs. Chambly and Casterline. The Regulations and Rulings required the ALJ to weigh the opinions of record-reviewing physicians under the regulatory factors, including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1527(d), (f); *see also* Social Security Ruling 96-6p, 1996 WL 374180. The Regulations appear to emphasize this requirement by reiterating it no less than three times. *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see also* 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same).

The ALJ also did not address Dr. Rahman's opinion that Plaintiff's symptoms of bipolar affective disorder with paranoid delusion and PTSD impeded her ability to cope with her physical pain. Dr. Rahman explained repeatedly that "her impairment is considerably compounded because of the combined effect of physical and mental afflictions." (*PageID#* 485). Dr. Rahman also noted, "It is well known that in those individuals who are suffering from chronic pain disorders the perception of pain is enhances if there is underlying depression. In addition, her coping skills are compromised because of chronic pain and depression." (*Id.*). Dr. Rahman's report explains this in some detail, a consideration the ALJ overlooked or ignored when rejecting this treating psychiatrist's opinions. *See PageID##* 76-77, 79. By failing to consider this feature of Dr. Rahman's report, the ALJ failed to recognize the language of the "supportability" factor, which promises, "The better

17

explanation a source provides for an opinion, the more weight we will give that opinion...." 20 C.F.R. 404.1527(c)(3). This, moreover, was an acute omission on the ALJ's part because Dr. Rahman's opinion was the only medical source opinion in the record addressing the combined impact Plaintiff's physical pain and depression had on Plaintiff's work abilities.

There remains the possibility, of course, that the ALJ's errors were harmless. The United States Court of Appeals has explained:

> "[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."

*Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545).

In this case, the ALJ's failure to comply with the good reason requirement was not harmless error. First, although Dr. Rahman's opinions may be inconsistent with some portions of the record, Dr. Rahman provided numerous written explanations for his opinions, *see PageID*# 483-92, such that it cannot be concluded that his opinions "are so patently deficient that the Commissioner *could not possibly* credit it..." *Wilson*, 378 F.3d at 547.

Accordingly, Plaintiff's challenges to the ALJ's assessment of the medical source opinions of record are well taken.[6]

---

[6] Plaintiff also contends that the ALJ erred in his assessment of her credibility. But, in light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's credibility arguments is unwarranted.

## VI.    **Remand Is Warranted**

If an ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak.  *See id.*  Yet, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g), due to the errors outlined above.  On remand, the ALJ should be directed (1) to re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) to reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB.  Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

**IT IS THEREFORE RECOMMENDED THAT:**

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Maria Kinsel was under a "disability" within the meaning of the Social Security Act;

3.      This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.      The case be terminated on the docket of this Court.

June 28, 2013

　　　　　　　　　　　　　　　s/Sharon L. Ovington
　　　　　　　　　　　　　　　　Sharon L. Ovington
　　　　　　　　　　　　Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).